UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | | |
|---|---|---|
| MARK LUKE ASTRACHAN | ) | |
| | ) | |
| V. | ) | NO. 2:14-CV-339 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | |

MEMORANDUM AND ORDER

This matter is before the United States Magistrate Judge with the consent of the parties and an order referring the case for entry of judgment [Doc. 25]. The plaintiff filed an application for childhood disability benefits pursuant to the Social Security Act. This is an action for judicial review of the final decision of the Commissioner to deny benefits following hearings before an Administrative Law Judge ["ALJ"]. The plaintiff has filed a Motion for Judgment on the Pleadings [Doc. 16], and the defendant Commissioner has filed a Motion for Summary Judgment [Doc. 19].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). ASubstantial evidence@ is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility.

*Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner=s decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, Aa decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.@ *Bowen v. Comm=r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

This is not a "typical" Social Security case. The plaintiff, who was born June 1, 1964 and who is now 51 years of age, is applying for "Child's Benefits" under 20 C.F.R. Ch. III, § 404.350(a)(5). That provision entitles one to disability benefits if "…you are 18 years old or older and have a disability that began before you became 22 years old...." The requirements were accurately described by plaintiff's counsel at the second administrative hearing on August 26, 2016. He stated that "[t]wo things have to be proven. Number one is that he's not able to work now. Number two, that he has been in that shape or at least unable to work continuously since before he attained age 22." (Tr. 41). Thus, in order to be entitled to benefits under this section, the plaintiff must establish that he became disabled prior to June 1, 1986, and is disabled today. In determining whether an individual was disabled during the relevant time period, the same five step sequential evaluation process found at § 404.1520(a) is utilized as is used in cases of claimants seeking benefits as an adult.

Plaintiff, while he has done some work in the past, has not engaged in substantial

2

gainful activity. He graduated from high school and attended college off and on for 11 years. There are no medical records from prior to June 1, 1986. The medical records that do exist are set forth in the Commissioner's brief as follows:

> Plaintiff started treating with Margaret Robbins, M.D., a psychiatrist, in 1999, when he was 34 years old (Tr. 339). At his intake assessment on January 26, 1999, Plaintiff reported that he had been treating with a therapist named Dr. Kutty, who advised him that he needed medication (Tr. 339). Plaintiff reported alcohol use, including a history of "bar hopping" on Friday nights in order to socialize over a period of three years (Tr. 339). Plaintiff also reported an engagement lasting two years and a history of romantic relationships that lasted six months or more (Tr. 340). Plaintiff attended college "on and off" after high school, including receiving scholarship money and living, part of the time, at a fraternity (Tr. 340). Although he reported earning many credits, he did not obtain a degree (Tr. 341). At the time, Plaintiff worked as a property manager for his family's business, but his "real occupation" was writing a novel (Tr. 341). Dr. Robbins observed that Plaintiff had normal, spontaneous movements; a sad facial expression; intact judgment; stable, but constricted affect; steady gait; direct eye contact; and a dysphoric and anxious mood (Tr. 342). Plaintiff had no unusual, repetitive mannerisms; no evidence of suicidal or homicidal ideations; and no psychosis (Tr. 342). Dr. Robbins assessed him with panic disorder without agoraphobia, adjustment disorder (unspecified), alcohol abuse, and narcissistic traits (Tr. 342). She prescribed Prozac and diazepam (Valium) (Tr. 343). Plaintiff also signed a release so that his sister could participate in his treatment plan (Tr. 343). His sister attended his follow-up appointment with Dr. Robbins and provided a "more complete history" (Tr. 336). Plaintiff and his sister reported a history of self-medicating anxiety issues with alcohol (Tr. 336).
> On June 10, 2009, Plaintiff reported that he was doing better with less medication and was busier with work (Tr. 334). Dr. Robbins stated that Plaintiff appeared immature and noted his excessive dependence on his sister (Tr. 334). Dr. Robbins also noted her wish to see Plaintiff independently, but that neither Plaintiff nor his sister had any interest in changing the relationship (Tr. 334). Plaintiff's next visit occurred on December 2, 1999 (Tr. 331). Dr. Robbins noted that Plaintiff had missed three appointments since their last encounter, that his sister was the motivating force for him to attend appointments, and that it was "ludicrous" to continue in this way (Tr. 331). She indicated that it was vital for Plaintiff to participate in his care and develop his own treatment goals, and the two developed a treatment contract (Tr. 331). During a discussion of his medical symptoms, Plaintiff reported that he was not disabled "in the sense of Social Security disability or in any other sense of the word" (Tr. 331). He reported that he had "great survivor skills" and that he did not require assistance (Tr. 331). His treatment plan included taking an active role in his treatment,

including partial payment for services, and taking control in vital areas of his life (Tr. 322). He was to find temporary work, refuse public assistance, and to produce written work before his next appointment (Tr. 332). Plaintiff reported that he was not depressed and could care for himself (Tr. 332). He stated that he was quiet and subdued since childhood and wanted to take control of his life, although he was uncertain how to do so (Tr. 332). Dr. Robbins opined that there was no evidence of any disability that would prevent Plaintiff from carrying out treatment goals (Tr. 332).

At his next appointment on February 22, 2000, Plaintiff presented with payment for the visit (Tr. 330). Dr. Robbins noted that Plaintiff was handling his affairs in "a more competent and adult fashion," and that he was making great effort toward treatment goals (Tr. 330). Three months later, Dr. Robbins noted Plaintiff had been "erratic" with his medication (Tr. 329). He also reported anxiety related to "DUI school," but there was no evidence of acute crisis (Tr. 329). Dr. Robbins adjusted his medication, including introducing Zoloft (Tr. 329). At the next appointment, on June 20, 2000, Plaintiff presented without his sister (Tr. 328). He reported that he was a shy person and was more comfortable socially with Zoloft (Tr. 328). Dr. Robbins noted that Plaintiff was making efforts to comply with the treatment contract and that there was no indication of any other problem (Tr. 328). Plaintiff had another appointment on September 28, 2000, and reported that he was more productive during the day after the change in medication, though he continued to depend on his sister (Tr. 327). Dr. Robbins noted that Plaintiff was improving and that his symptoms appeared to be the result of a personality disorder rather than "Axis I difficulty" (Tr. 327). At his follow-up visit on March 8, 2001, he reported doing very well on medication and stated that he had submitted several articles for publication (Tr. 326). Subsequently, Plaintiff reported continued efforts to write and efforts to improve his writing (Tr. 325).

On July 24, 2001, Dr. Robbins noted that Plaintiff's family treated him like a teenager and that efforts to increase his independence had not been fruitful (Tr. 325). He appeared immature (Tr. 325). She noted, however, that he was becoming more independent and that he had ambitions to pay his own expenses (Tr. 325). On March 12, 2002, Plaintiff reported paying rent to his sister (Tr. 324). He had also decided to apply for a job (Tr. 324). Plaintiff asked to discontinue Zoloft due to sexual side effects and was very active in that discussion (Tr. 324). Dr. Robbins noted that Plaintiff was becoming more independent (Tr. 324). At the next appointment, Plaintiff was more logical, coherent, and goal-directed (Tr. 323). Dr. Robbins noted that Plaintiff's sister felt that he was an artist who was entitled to focus on his art and allow others to manage his affairs (Tr. 323). She advised Plaintiff's sister that he should be allowed to do things on his own (Tr. 323). Dr. Robbins noted that when problems arose, Plaintiff's sister immediately stepped in to right things (Tr. 323). Dr. Robbins assessed Plaintiff with avoidance and noted that Plaintiff felt that, as a writer, he needed to be eccentric in order to live like Hemmingway (Tr. 323). She

4

noted that he incorporated this "theory of living, into all aspects of his life" and opined that this theory may account for some of Plaintiff's unusual behavior (Tr. 323). Subsequently, Dr. Robbins noted poor participation in the treatment plan and noted Plaintiff's family continued to support his ambition to write professionally (Tr. 322).

By June 10, 2003, when Plaintiff's sister presented on his behalf at his appointment, Plaintiff had missed eight appointments since June of 2000 (Tr. 321). By August of 2003, he had missed nine appointments (Tr. 317). Dr. Robbins noted that he used fantasy to substitute for hard work (Tr. 318). In June of 2004, Plaintiff reported that he was cured and stated that he was becoming more involved in his art (Tr. 319). In March of 2005, Dr. Robbins notified Plaintiff that he was not a child, could handle his own affairs, and that she needed to see him regularly if they were to continue working together (Tr. 312). He did not return until February 2, 2006, and reported that he had gone for long periods of time without medication, and therefore had not requested any refills (Tr. 311). At his follow-up in August of 2006, Dr. Robbins noted that Plaintiff became emotional after encountering a couple in the waiting area whose baby died (Tr. 310). She noted he had a tender heart and great sensitivity to others (Tr. 310). On August 23, 2007, Dr. Robbins noted that Plaintiff removed his cap when he entered the room, was very polite interpersonally, and obeyed conventional rules for politeness (Tr. 307). Per his report of August 27, 2009, Plaintiff spent his days watching television (Tr. 302). Dr. Robbins observed that his family believed he was a talented artist who was misunderstood by the world (Tr. 302).

On March 4, 2010, Plaintiff presented to Dr. Robbins rocking back and forth with complaints of acute panic (Tr. 299). His sister accompanied him (Tr. 299). He reported paranoid ideation since childhood that manifested in his schooling (Tr. 299). Plaintiff reported that his symptoms continued into adulthood and now occurred spontaneously (Tr. 299). He reported cationic symptoms and sensitivity to noise and stated that he could not write or engage in any activities (Tr. 299). Plaintiff stated that he felt so good after taking Wellbutrin that he discontinued it and Zoloft (Tr. 300). Discontinuing his medication resulted in recurrent symptoms (Tr. 300). Dr. Robbins noted that there was no evidence of psychiatric emergency requiring hospitalization (Tr. 300). She adjusted his medication (Tr. 301). He reported improvement with the changed medication at his follow-up appointments (Tr. 296, 298). On May 10, 2011, Dr. Robbins noted that Plaintiff showed "remarkable" lack of insight regarding what he should share with her (Tr. 296). He showed no interest in living independently (Tr. 296). Plaintiff and his family applied for benefits on June 30, 2011 (Tr. 144-47).

On October 20, 2011, Plaintiff reported difficulty leaving his house, and Dr. Robbins noted that in the past, he would not have attempted to make the appointment (Tr. 386). He appeared anxious (Tr. 386). Dr. Robbins noted that Plaintiff's family had compelled him to apply for Social Security benefits because they could not care for him forever (Tr. 386). She added schizotypal personality disorder to her existing diagnoses (Tr. 386). Dr. Robbins also noted no evidence

5

of intent to harm self or others, no acute psychotic decompensation, and no acute crisis requiring hospitalization (Tr. 386). She continued his medication and set a follow-up appointment (Tr. 386).

With the help of his sister, Plaintiff prepared an adult function report around December 9, 2011 (Tr. 239). In it, Plaintiff described a number of rituals he must complete every day due to his obsessive-compulsive disorder (Tr. 229). He reported that, between 1984 and 1986, he was able to function well enough to attend college, socialize a bit, date, and engage in life (Tr. 230). He reported that he was unable to see when his apartment needed cleaning, but that he was fanatic about a clean bathroom (Tr. 232). He stated that when his sister pointed out to him what needed to be cleaned, it made him not want to do it (Tr. 232). He reported that he shopped at Books a Million, Target, and Pier 1, noting that "finding a little piece of decoration is really my only joy" (Tr. 232). He did not go to church due to fear of being around people (Tr. 233). He reported that he has always had problems handling money (Tr. 232). Plaintiff's report also described his "flicking" behavior, which caused him to push his finger into one of his rings, his "compulsion to rock," and his paranoia (Tr. 228-36). He also described his "relationship" with his SUV, which he called "San," and with a stuffed dog, which he described as his "best and only friend" (Tr. 237). Plaintiff also stated that he changed his name because he did not feel part of his "earth family" and that the name "Astrachan" came to him in a dream (Tr. 236). At the end of his 10-page, typed, single-spaced addendum to the Adult Function Report, Plaintiff noted that his sister "really" limited what he wanted to say (Tr. 227-37)

Dr. Robbins gave sworn testimony on June 4, 2012 (Tr. 255-88). She stated that she had been treating Plaintiff since 1999 and that he would not present for appointments with her unless he "coached himself to be brave enough to face the world" (Tr. 259). She also stated that he needed to feel secure in order to be around people (Tr. 259). Dr. Robbins stated that Plaintiff had an "erratic" pattern of missing appointments and running out of medication, but not telling her why he could not come into the office (Tr. 259-60). She testified that Plaintiff's sister became involved in his treatment and that she began to understand that Plaintiff's phobias and preoccupations played a role in his noncompliance (Tr. 260-61). Plaintiff's sister tried to help him get a job doing yard work with his brother-in-law, but he become anxious about making errors and "disintegrate into self-absorption, self-recrimination" and concern about whether he was doing what "normal people" would do (Tr. 262). Dr. Robbins stated that Plaintiff changed his name to Astrachan because it was poetic and he wanted to be a world-famous writer (Tr. 262). He reported to Dr. Robbins that he stayed home alone because he was in the process of becoming a great writer (Tr. 263). Dr. Robbins diagnosed Plaintiff with schizotypal personality disorder, indicating many oddities, but not reaching the level of psychosis (Tr. 266). She described schizotypal individuals as those commonly known as hermits or recluses, who were clearly not with the "social flow," but who were not "quite so crazy as to be psychotic or disruptive of the social flow" (Tr. 266). She also stated that Plaintiff got anxious when people

6

checked on him because he did not understand what they were doing (Tr. 266). She stated that he became depressed and suicidal at times (Tr. 267). Plaintiff's sister had reported that Plaintiff's first words were "don't talk," which suggested autism spectrum disorder, but Plaintiff was never diagnosed and did not receive support for that condition in childhood (Tr. 270). Dr. Robbins stated that she had no reason to believe Plaintiff could do any more than he was doing at the time (Tr. 274). She stated that, in her opinion, Plaintiff's impairment equaled the listing of autism as a child and that it currently equaled a listing under the combination of schizotypal personality disorder (Tr. 279). She testified that his impairment equaled a listing from Plaintiff's childhood to the present (Tr. 279). Dr. Robbins stated that activities of daily living were challenging for Plaintiff and that he will always be odd (Tr. 280). When asked by Plaintiff's attorney whether his ability to relate to coworkers was fair, poor, or none, Dr. Robbins stated that it was "essentially none" (Tr. 281). She stated that he had no ability to interact with supervisors or deal with normal work stresses and could maintain attention and concentration episodically for short periods of time (Tr. 281). In her opinion, Plaintiff could understand and remember instructions, but could not carry them out (Tr. 282). Dr. Robbins opined that Plaintiff's ability to maintain personal appearance, behave in an emotionally stable manner, and predictably deal with social situations was erratic (Tr. 282). She stated that she believed Plaintiff had been impaired since childhood and that he was in a category of people too impaired to apply for disability (Tr. 284). Dr. Robbins stated that Plaintiff would require a payee for any benefits he received and that he was unable to manage his own income (Tr. 287). His family provided a monthly budget, which he exceeded by ordering pizza when he did not want to leave his apartment (Tr. 286). She stated that Plaintiff's sister paid for his therapy and that he expected others to do this for him (Tr. 287). She also stated that Plaintiff recalled "with great triumph" that he had walked to the pharmacy and obtained his own medication (Tr. 287).

At his follow-up appointment with Dr. Robbins on March 28, 2013, a year-and-a-half after the prior appointment, Dr. Robbins added the diagnosis of a history of autism as child-based on the family's report (Tr. 470). Unable to describe his symptoms in detail, Plaintiff described difficulties with personal care due to severe eczema, which Dr. Robbins classified as an example of sensory difficulties that made it difficult for Plaintiff to care for himself (Tr. 470). He was non-compliant with his medication, and Dr. Robbins stated Plaintiff was too impaired to apply for disability on his own behalf (Tr. 470). She noted "since the client did not receive services as a child for his autism, his current complaints going back to childhood have been difficult to document" (Tr. 470). He reported a history of being teased, which made him avoid going out into the public (Tr. 470).

Between 1999 and 2013, Dr. Robbins diagnosed Plaintiff with panic disorder, adjustment disorder (unspecified), panic disorder with agoraphobia, alcohol dependence, dysthymia, obsessive compulsive disorder with hypochondriac-type symptoms, somatic preoccupations, caffeineism, generalized anxiety disorder, major depression, schizotypal personality disorder, and, most

7

recently, history of autism as a child (Tr. 294-344; 386-434). Over the course of treatment, Dr. Robbins noted that Plaintiff appeared unusually close to and dependent on his sister, who treated Plaintiff as a parent would treat a child, noting "this seems to be what the family wishes for itself and its members" (Tr. 335-36). She noted that the family's tendency to "pamper[] and cater[]" to Plaintiff (Tr. 304).

Chad R. Sims, Ph.D., H.S.P., performed the consultative examination on April 13, 2013 (Tr. 435-40). Plaintiff's hygiene and cleanliness were fair, and he had a normal gait (Tr. 436). Plaintiff was the sole source of information for the exam (Tr. 435). He rocked during the interview, which, according to Plaintiff, was due to anxiety (Tr. 436). He stated that he rocked almost constantly, with the possible exception of public places (Tr. 436). Per his report, Plaintiff carried private health insurance and received financial support from his father, but had no other financial support (Tr. 436). Plaintiff initially denied auditory or visual hallucinations, although he reported an instance of smelling things that others could not smell two years earlier and reported hearing the sound of crickets in his head every two weeks (Tr. 437). He also reported constantly seeing others' words above their heads as they spoke, but this was not alarming to him (Tr. 337). Plaintiff reported loss of interest, lethargy, social isolation, and loss of libido (Tr. 437). Dr. Sims noted that Plaintiff had difficulty providing examples of other symptoms (Tr. 437). Dr. Sims also noted that Plaintiff contradicted himself, first stating that he could not leave the apartment to go to his mailbox and then stating he went grocery shopping every two weeks and to get fast food three times per week (Tr.437). Dr. Sims did not observe clear evidence for manic or hypomanic episodes (Tr. 437). Plaintiff was able to complete a mental status exam, but his thought process included illogical thinking (Tr. 438). Dr. Sims noted Plaintiff had no impairment in his ability to sustain concentration, although he reported marked anxiety (Tr. 438). Plaintiff showed no impairment in his long-term and remote memory functioning (Tr. 438). Dr. Sims noted factors suggestive of malingering including endorsement of atypical symptoms, vague descriptions of psychiatric complaints, contradictions in descriptions of out-of-home activity, and his report of psychotic symptoms (Tr. 438). Dr. Sims also noted that despite complaints of marked anxiety, Plaintiff sustained concentration through the mental status exam (Tr. 438-39). With respect to daily living, Plaintiff reported that he managed medication without difficulty, managed his finances with some difficulty, prepared simple meals, swept and cleaned the bathroom, and drove twice a week (Tr. 439). Dr. Sims noted that Plaintiff's probable exaggeration made him a questionable historian and made it difficult to assess his reported anxious and depressed state (Tr. 440). Dr. Sims concluded that there was no indication that Plaintiff was not capable of managing his own finances (Tr. 440).

On May 7, 2013, Plaintiff's attorney procured an additional evaluation to address Dr. Sims' conclusion that Plaintiff was exaggerating or malingering (Tr. 463). Edward Latham, Ph.D., administered personality and cognitive assessments, interviewed Plaintiff and his sister, and reviewed documentation that the family

8

and Plaintiff's attorney provided (Tr. 464). He determined that Plaintiff showed evidence of severely disrupted emotional functioning and was in a depressed phase (Tr. 466). Dr. Latham also observed that Plaintiff showed evidence of "unusual beliefs consistent with his mood and involving a sense of being special," and "being the target of unknown ominous forces" which was consistent with a "major" mental disorder (Tr. 466). He opined that dissimulation was not present due, in part to the consistency and depth with which Plaintiff described his experiences (Tr. 466). In conclusion, Dr. Latham stated that Plaintiff appeared able to retain and follow simple instructions and do routine, repetitive tasks (Tr. 466). He stated that Plaintiff's attention and concentration appeared sufficient, but his ability to relate interpersonally was markedly impaired (Tr. 466). Dr. Latham also opined that Plaintiff's condition originated in the developmental period and that he was capable of handling funds in his own best interest (Tr. 466).

[Doc. 20, pgs. 2-13]

Subsequent to the ALJ's hearing decision, plaintiff's older brother, Dr. Steven L. Gray, PsyD, a clinical psychologist, submitted an opinion letter (Tr. 473-477). He recounted plaintiff's childhood history and opined that plaintiff suffered from schizotypal personality disorder, panic disorder with agoraphobia, and major depressive disorder, severe, with psychotic features.

At the administrative hearing on August 26, 2013, the ALJ called Bentley Hankins, a vocational expert ["VE"]. He asked him to assume a person of plaintiff's age, education and work experience who is "limited to simple, routine, repetitive work; better with things than people but with no public contact at all." He then asked if there would be jobs for such an individual at the light and medium levels of exertion. Mr. Hankins identified jobs as a laboratory equipment cleaner, automobile detailer and hand packager at the medium level. At the light level, he opined there were jobs as a production worker or labeler, wire harness assembler, and production inspector. The numbers of

9

these jobs represent a significant number in the national and regional economies. The ALJ then asked him if there would be any jobs if the plaintiff's testimony at the hearing was "true and correct." Mr. Hankins stated there would be no jobs. (Tr. 66-68).

On September 13, 2013, the ALJ rendered his decision. He found that "[p]rior to attaining age 22, the claimant had the following medically determinable impairment: history of autism as a child." (Tr. 15). Notably, he did not find that this was a "severe" impairment. He also found that, prior to age 22, plaintiff "did not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months…" *Id.*

The ALJ then proceeded to analyze plaintiff's credibility. He discussed plaintiff's testimony at the hearing in great detail, as well as the testimony of plaintiff's sister. He then stated that he found that plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible…" (Tr. 16-17). The ALJ noted that the plaintiff's only evidence of a physical ailment of any kind was treatment for eczema, with "no medical evidence of treatment for eczema prior to age 22." Also, the evidence regarding eczema did "not reflect any complications or limitations of function…" due to that condition (Tr. 17).

The ALJ then stated that, with respect to any mental impairment, there was no record of treatment prior to age 22. Instead, the ALJ noted that plaintiff attended college during those years, lived independently of family members, and received no treatment for

10

any mental impairment during that period. He found that that plaintiff's "credibility is diminished based on his lack of treatment." (Tr. 17). The ALJ also stated there was "no clinical evidence of any impairment" between June 1, 1982, when plaintiff turned 18, through June 1, 1986, when he turned 22. The ALJ stated that plaintiff was "not presently getting regular treatment." (Tr. 17). This was obviously a reference to the great periods of time between plaintiff's visits with his treating psychiatrist, Dr. Margaret Robbins.

The ALJ then discussed in great detail a deposition of Dr. Robbins taken by plaintiff's attorney in 2012, and a letter from her dated September 6, 2013 (Tr. 18-19). Dr. Robbins testified in the deposition that plaintiff's first visit was January 26, 1999, which the ALJ noted was "[o]ver 12 years after the date that the claimant obtained age 22…." (Tr. 19).

The ALJ then noted the examination of the plaintiff which he had ordered after the first administrative hearing conducted by Dr. Chad Sims, a psychologist, on April 11, 2013. (Tr. 10-20). Dr. Sims' report is found in the record at pages 436-443. The report was notable for its diagnosis of "probable symptom exaggeration." (Tr. 440). The ALJ also discussed the examination by Dr. Edward Latham performed at plaintiff's request (Tr. 20-21). He also noted that the State Agency non-examining physicians and psychologists had stated that there was insufficient evidence to assess plaintiff's true state during the relevant time period prior to plaintiff attaining the age of 22 (Tr. 21).

The ALJ then assessed the weight he gave to the medical opinion evidence. He

11

gave some weight to the State Agency physicians who found insufficient evidence of any mental impairment during the relevant time period. He stated he nevertheless gave the plaintiff the benefit of the doubt in finding the plaintiff, at least, had the medically determinable impairment of a history of childhood autism. He gave little weight to Dr. Robbins because she did not examine the plaintiff until over 12 years after he attained age 22. He gave little weight to Dr. Sims because Dr. Sims' report suggested probable symptom exaggeration. He gave little weight to Dr. Latham because his opinion was not supported by any medical records from during the relevant period. (Tr. 21). He also gave little weight to the testimony of the plaintiff's sister (Tr. 22).

The ALJ found that the plaintiff had no more than mild limitations in activities of daily living; social functioning; and concentration, persistence or pace. In this regard, he noted the plaintiff's present activities of daily living and what evidence there was from the period at issue, such as attending college and living in a dorm. He mentioned the plaintiff's attention and concentration skills and his ability to follow written and spoken instructions. Because he found that the plaintiff had no more than mild limitations and no severe impairment prior to turning 22, he found that the plaintiff was not disabled (Tr. 22-23).

Plaintiff argues that the ALJ's opinion lacks supportive substantial evidence. He states that the ALJ erred in believing that plaintiff was not entitled to benefits because there was no medical evidence from the time before he turned 22 years of age. In this regard, plaintiff asserts that Social Security Ruling ["SSR"] 83-20 states that "it may be

possible, based upon the medical evidence, to reasonably infer that the onset of a disabling impairment occurred sometime prior to the date of the first examination." [Doc. 17, pg. 12]. He argues that this medical evidence was supplied by Dr. Robbins' opinion, and that the ALJ erred in giving her opinion little weight, stating that her opinion is entitled to controlling weight since there is no evidence to contradict her opinion that he has been severely impaired since childhood. Plaintiff also asserts that the ALJ erred in not finding that his childhood autism was a severe impairment. In fact, he argues that Dr. Robbins' opinion that he equaled a listed impairment should have been fully credited, along with her opinion that he has been unable to work at any time.

As an initial matter, one must not confuse the issue of whether the plaintiff has established that he suffers from a severe impairment *now* with the issue of whether he established a severe impairment and that he was disabled by that severe impairment with an onset date *between the ages of 18 and 22*. To be sure, there are considerable difficulties in determining a disability onset date which could be no later than May 31, 1986, when the earliest medical evidence on the subject is from an examination that took place over 12 years after that date. That is plaintiff's burden. Also, it must be borne in mind that the claim for child's disability is the sole application pending, and plaintiff's condition in the years since he turned 22 are, at best, half of the equation.

The issues in this case, whether stated as the existence or not of substantial evidence to support the ALJ's rejection of some of the plaintiff's subjective complaints, or as an inappropriate rejection of Dr. Robbins' opinion based upon those subjective

13

complaints, are all tied to plaintiff's credibility. Certainly, the ALJ could consider as one factor in this regard that no contemporaneous medical record exists from the period before plaintiff turned 22, or from anywhere close to that time. But that is not the only factor that was before the ALJ, and it was not the only factor upon which he based his rejection of plaintiff's subjective complaints regarding how plaintiff fared during that time period. As stated above, the ALJ considered the plaintiff's college attendance and living away from home during the time before he reached the age of 22. Also, he was aware that plaintiff was not seeing Dr. Robbins on a frequent basis (Tr. 17). Instead, plaintiff saw her only once or twice per year during most of the years she treated him. While it is true that the failure of a mentally ill individual to seek treatment may be a symptom of the disease, plaintiff's sister was heavily involved in seeing that he was treated by Dr. Robbins. The Court notes that plaintiff did not visit Dr. Robbins between October 20, 2011, and March 28, 2013. Most tellingly, the diagnosis of childhood autism was not generated by Dr. Robbins until the March 28th, 2013 visit, and at the very visit in which she noted that plaintiff was having trouble obtaining Social Security disability, stating because he "did not seek services as a child for his autism, his current complaints going back to childhood have been difficult to document." (Tr. 470). Thus, the autism diagnosis did not appear until after 30 visits with Dr. Robbins and 14 years into her treatment of plaintiff, which itself began over 12 years after he reached age 22. The schizotypal personality disorder diagnosis was not made until October 20, 2011.

It is true that great deference must be given to the opinion of a treating physician.

14

Case 2:14-cv-00339-MCLC   Document 26   Filed 02/26/16   Page 14 of 16   PageID #: 1087

In fact, as stated by plaintiff, an ALJ must assign controlling weight to an opinion of a treating doctor when it is supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with other substantial evidence in the record. However, as stated by the Commissioner, "the Sixth Circuit has held that the treating physician's opinion may be discounted when it is based on subjective complaints, when there are large gaps in treatment, when it is not supported by objective clinical findings, and when it is inconsistent with other evidence." *Tate v. Comm'r of Soc. Sec.*, 467 Fed. App'x 431, 433, (6th Cir. 2012).

There is evidence which is inconsistent with Dr. Robbins' opinion. Plaintiff, who is quite articulate and a coherent writer, completed a detailed printed adult function report. In answer to the question "what were you able to do before your conditions that you can't do now" stated that "there was a time from 1984 to 1986 when I was able to function enough to attend college, and did limited periods of work. I was able to socialize enough, date a bit, and engage in life to the point I felt almost normal." (Tr. 230). This is strong evidence in the plaintiff's own words that his condition did not become disabling through the year 1986, which the key issue of the entire case. Likewise, the examination and report by Dr. Sims, with his diagnosis of apparent symptom exaggeration, contradicts Dr. Robbins' opinions.

The Appeals Council considered the opinion letter from the plaintiff's brother, Dr. Gray, and they found "this information does not provide a basis for changing the Administrative Law Judge's decision.
15

While there is strong evidence suggesting the presence of a severe impairment at the present time, the Court must find in this case that there is substantial evidence to support the ALJ's finding that the plaintiff did not have a severe impairment prior to attaining the age of 22. As previously stated, a variety of reasons support his determination. Accordingly, the plaintiff's Motion for Judgment on the Pleadings [Doc. 16] is DENIED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 19] is GRANTED.

SO ORDERED:

 s/ Clifton L. Corker
UNITED STATES MAGISTRATE JUDGE